SUSAN M. CHEHARDY, Chief Judge.
^Defendant, Mekale T. Thompson, appeals from his conviction of second degree murder and sentence of life imprisonment. For the reasons that follow, we affirm his conviction and sentence.
PROCEDURAL HISTORY
On August 18, 2011, a Jefferson Parish Grand Jury indicted defendant with the second degree murder of Delast Francois. Defendant pled not guilty and the matter proceeded to trial by jury on April 1, 2014. Following a three-day trial, the twelve-person jury returned a verdict of guilty as charged. On May 2, 2014, following the denial of defendant’s motions for new trial and post-verdict judgment of acquittal, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This timely appeal followed.
FACTS
At approximately 2:45 p.m. on the afternoon of April 27, 2011, Delast Francois, the victim, and Kasee Thornton, his girlfriend, arrived in Ms. Thornton’s ^vehicle at the house of Arthur Simmons at 2128 Huey P. Long Avenue in Gretna, Louisiana. The victim was friends with Mr. Simmons’ nephew, Chandrick “Smurf” Harris,[1] who often visited his uncle and was there that day. Defendant, who was also friends with Mr. Harris and the victim, was there too. When Ms. Thornton and the victim arrived, they found defendant and “another guy” standing on the front porch. Ms. Thornton remained in the vehicle while the victim exited, proceeded to the front porch, and began to exchange words with defendant. Ms. Thornton was unable to hear their conversation but soon observed the confrontation become physical as the two men grappled and traded punches. At this point, Mr. Harris exited the house and broke up the fight. Defendant then retreated inside while the victim proceeded to the front porch of the neighbor’s house at 2130 Huey P. Long Avenue where he conversed with Joshua and Tedra Carter.
Ms. Thornton called to the victim, telling him they should leave. He refused and asked Ms. Thornton to open her trunk, in which she kept a baseball bat, but no firearms. She did not observe the victim retrieve the bat or anything else from the trunk, and watched as he returned to the neighbor’s porch.
Five or ten minutes after defendant had left the scene, Ms. Thornton noticed him reappear with a “fairly large rifle.” At this point, he chased the victim around the two houses and discharged the rifle four or five times. Ms. Thornton saw the victim, who was bleeding, come from behind the houses running towards her when he fell to the ground. Ms. Thornton called 9-1-1.
Several officers of the Gretna Police Department and EMS responded to find the victim unresponsive. He was pronounced dead on the scene. A subsequent | ¿autopsy revealed that three gunshot wounds were the cause of death. At the murder scene, officers located four 7.62 x 39 mm spent casings — two in the front yard, two in the rear — and an AK-47 assault rifle stashed underneath a nearby house. The rifle contained one round in the chamber and was loaded with a maga *887 zine containing several more rounds. A trail of blood led around both houses.
Officers spoke with several eyewitnesses. Arthur Simmons explained that he was inside when he was roused by the sounds of an argument outside. He looked out the door to find the victim and defendant fighting and Mr. Harris attempting to break it up. Mr. Simmons told them to leave and returned inside after the fight ended. Several minutes later Mr. Simmons heard gunshots, but did not observe anything further until the police arrived. He explained that he does not own a gun and that he had never before seen the murder weapon in his house. He also testified that there was blood on his front porch from defendant’s eye which had been injured in the fight with the victim. He identified defendant from a photographic lineup as the person fighting with the victim shortly before the gunfire.
Joshua Carter, who was familiar with the victim and defendant from the neighborhood, explained that on April 27, 2011, he stepped onto his porch to smoke a cigarette. His wife, Tedra Carter, who heard a “ruckus” outside, soon joined him with their two-year-old nephew. As Mrs. Carter stepped outside, she found the victim explaining to her husband that he had been fighting with defendant over a bicycle. At this time Mr. Carter noticed Mr. Harris cleaning up blood on the porch next door.
According to Mr. Carter, he spoke with the victim for approximately twenty minutes before he observed defendant return with, as his wife described, a “big gun.” Defendant opened fire, the victim ran, and defendant gave chase. Mr. Carter | Rhurried his wife and nephew inside and locked the door. He remained outside where he heard the victim pleading with defendant: “You don’t have to go this far.” From inside, Mrs. Carter heard the victim begging defendant to “chill out” and then heard more gunshots.
Mr. and Mrs. Carter testified that they never saw the victim with a gun, a bat, or any other weapon, nor did they observe blood on defendant’s face. Mr. and Mrs. Carter, as well as Ms. Thornton, identified defendant as the gunman from photographic lineups.
A search warrant was obtained for defendant’s house at 2121 Rose Drive in Gretna, which is approximately three blocks away from the murder scene. The search turned up one 7.62 x 39 mm round of ammunition in defendant’s bedroom which was consistent with the casings and weapon recovered from the scene. It was also determined that the location from which the rifle was recovered is between the murder scene and defendant’s house.
Officer Jene Rauch, a firearm and tool-mark examiner with the Jefferson Parish Sherriffs Office Crime Lab and an expert in forensic firearm examination, compared the four casings and the assault rifle recovered from the scene. Although she was unable to definitively state that the four casings had been discharged from the rifle, she also could not state that they had not been. She further explained that the caliber of the rifle and the rounds found with it matched the caliber of the four casings recovered from the scene.
Defendant turned himself in to the police on May 2, 2011. At trial, he took the stand and admitted that he shot the victim. He explained that on April 27, 2011, he was on the porch with Mr. Harris and a third individual, “Chris,” when the victim arrived, proceeded onto the porch, and threw the first punch. During the fight, the two men fell off the porch and the victim bit defendant’s eye, obstructing | fihis vision. Defendant freed himself and retreated into Mr. Simmons’ house where he *888 retrieved the rifle, exited the back door, returned to the front of the house, fired a shot, and then chased the victim around the two houses, discharging several more rounds. Defendant stated that it took him one or two minutes to retreat into the house, retrieve the rifle, and return outside. Defendant further testified that he was “enraged” and “mad” and “wasn’t thinking about nothing.” He explained that he would not have done it if he had not been so mad and stated that he was “sorry about it.”
DISCUSSION
In defendant’s sole assignment of error on appeal, he argues that the evidence was insufficient to support his conviction of second degree murder. He contends that no rational trier of fact could have found guilt of second degree murder beyond a reasonable doubt when the unrebutted evidence established the elements of the lesser offense of manslaughter.
The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La.C.Cr.P. art. 821. State v. Bazley, 09-358 (La.App. 5 Cir. 1/11/11), 60 So.3d 7, 17, writ denied, 11-0282 (La.6/17/11), 63 So.3d 1039. Here, defendant filed a motion for post-verdict judgment of acquittal in which he argued the evidence supported only the lesser offense of manslaughter, not second degree murder. Therefore, this assignment of error is properly before us on appeal.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Mickel, 09-953 (La.App. 5 Cir. 5/11/10), 41 So.3d 532, 534, writ denied, 10-1357 (La.1/7/11), 52 So.3d 885.
This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact’s rational credibility calls, evidence weighing, and inference drawing. State v. Caffrey, 08-717 (La.App. 5 Cir. 5/12/09), 15 So.3d 198, 202, writ denied, 09-1305 (La.2/5/10), 27 So.3d 297. This deference to the fact finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. Id. As a result, under the Jackson standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240.
In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. Caffrey, supra. Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. See State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is *889 sufficient to support a conviction. State v. Dixon, 07-915 (La.App. 5 Cir. 3/11/08), 982 So.2d 146, 153, writ denied, 08-0987 (La.1/30/09), 999 So.2d 745.
In the instant case, defendant was charged with and convicted of second degree murder, a violation of La. R.S. 14:30.1. Second degree murder is defined, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. See La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. State v. Seals, 09-1089 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, 306, writ denied, 12-0293 (La.10/26/12), 99 So.3d 53, cert. denied, — U.S. -, 133 S.Ct. 2796, 186 L.Ed.2d 863 (2013) (citing La. R.S. 14:10(1)). The determination of specific intent is a question of fact. Id., 83 So.3d at 306. Specific intent may be inferred from the circumstances and from the defendant’s actions; and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. Id. Further, a specific intent to kill may be inferred from the intentional use of a deadly weapon such as a knife or gun. State v. Cochran, 09-85 (La.App. 5 Cir. 6/23/09), 19 So.3d 497, 508, writ denied, 09-1742 (La.3/26/10), 29 So.3d 1249; see also State v. Gonzalez, 07-449 (La.App. 5 Cir. 12/27/07), 975 So.2d 3, 8, writ denied, 08-0228 (La.9/19/08), 992 So.2d 949 (“The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill.”).
In addition to proving each statutory element of the crime charged, the State must also prove the identity of the perpetrator. State v. Williams, 08-272 (La.App. 5 Cir. 12/16/08), 3 So.3d 526, 529, writ denied, 09-0143 (La.10/16/09), 19 So.3d 470. Thus, in order to carry its burden of proof, the State is required to negate any | ^reasonable probability of mis-identification. Id. Positive identification by only one witness is sufficient to support a conviction. Id.
In the instant ease, the evidence adduced at trial was clearly sufficient for any rational trier of fact to have found defendant guilty of second degree murder beyond a reasonable doubt. Three eyewitnesses — Ms. Thornton, and Mr. and Mrs. Carter — testified that they observed defendant shoot the victim. Plus, defendant himself admitted to shooting the victim. From this, we conclude that any rational trier of fact would have found beyond a reasonable doubt that defendant acted with the specific intent to kill or to inflict great bodily harm.
Our inquiry does not end here, however, because defendant argues that the evidence supported the lesser offense of manslaughter where he shot the victim in a sudden passion or heat of blood.
Manslaughter is defined as a homicide that would be a first or second degree murder, except that the offense is committed in a sudden passion or heat of blood immediately caused by a provocation sufficient to deprive an average person of his self-control and cool reflection. See La. R.S. 14:31(A)(1). Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that the average person’s blood would have cooled, at the time the offense was committed. Id. “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors that may reduce the grade of the offense. State v. Bauman, 08-1169 (La.App. 5 Cir. *890 5/12/09), 15 So.3d 177, 185, writ denied, 09-1533 (La.4/23/10), 34 So.3d 300.
In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Bauman, supra. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary |inself-control. Id. The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Id.
Defendant contends that the victim’s biting his eye deprived him of his self-control and cool reflection, provoking him to shoot Delast Francois in a sudden passion or heat of blood. In assessing a charge of manslaughter, the trier of fact must consider the following two questions. Was the claimed provocation sufficient to deprive an average person of his self-control and cool reflection? And was there sufficient time between the claimed provocation and the hot-blooded action such that defendant’s blood had actually cooled, or that the average person’s blood would have cooled?
As to the first question, there was inconsistent testimony regarding defendant’s eye injury. Mr. Simmons testified the blood on his front porch originated from defendant’s eye injury. And although Mr. Carter testified that he observed Mr. Harris cleaning up blood on the porch, both he and his wife stated that they did not observe blood on defendant’s face. Defendant’s booking photographs, taken five days after the incident, depict a scabbed wound on his right eyebrow. As to the second question, there was conflicting testimony regarding the duration between the provocation and defendant’s hot-blooded action. Defendant testified that one or two minutes elapsed; Mr. Carter testified twenty minutes; and Ms. Thornton testified five or ten minutes.
The resolution of this inconsistent and conflicting testimony rested solely with the trier of fact; and in finding defendant guilty of second degree murder, the jury evidently resolved these questions in favor of the State and against defendant. We will not re-evaluate the credibility of witnesses or re-weigh the evidence. | Therefore, viewing this evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found that the mitigatory factors were not established by a preponderance of the evidence.
This assignment of error is without merit.
ERRORS PATENT
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). No errors patent were found in this case.
DECREE
For the foregoing reasons, defendant’s conviction of second degree murder and his sentence of life imprisonment are affirmed.

AFFIRMED

. Chandrick Harris was murdered the next day, April 28, 2011, by Derrick Francois, the victim’s brother. Derrick Francois was convicted of second degree murder which this Court affirmed on appeal. See State v. Francois, 13-616 (La.App. 5 Cir. 1/31/14), 134 So.3d 42, writ denied, 14-0431 (La.9/26/14), 149 So.3d 261.